# UNITED STATES DISTRICT COURT
для the
Southern District of Ohio

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| Craig Cato | ) | Case No. 1:24-mj-809 |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of March 2024 to 10/15/2024 in the county of Scioto in the
Southern District of Ohio, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 | Conspiracy to distribute and possess with intent to distribute controlled substances |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) | Distribution of controlled substances |
| 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) | Possession with intent to distribute controlled substances |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

*Brandon Harris*
Complainant's signature

SA Brandon Harris, DEA
Printed name and title

Sworn to before me and signed in my presence.
**via FaceTime video**

Date: 10/15/2024

Karen L. Litkovitz
United States Magistrate Judge

City and state: Cincinnati, Ohio

## AFFIDAVIT IN SUPPORT OF A
## CRIMINAL COMPLAINT AND ARREST WARRANT

I, SA Brandon Harris, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1. This affidavit is made in support of a criminal complaint to arrest and charge Demetrius HARMON, Craig CATO, Christle SCARBERRY, and Ryan PORTER with: (1) conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 (all Defendants); (2) distribution of controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (HARMON, CATO, and SCARBERRY); and (3) possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (all Defendants). The Defendants are part of a drug trafficking organization (the "DTO") that has been distributing cocaine, fentanyl and methamphetamine throughout the Southern District of Ohio, including in Portsmouth, Ohio.

2. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA) and have been since February 2020. I am currently assigned to the DEA's Charleston District Office (DEA Charleston, WV). I received specialized training from the DEA, including the 18-week Basic Agent Training course. This training focused on methods of unlawful drug trafficking; the identification of controlled substances; surveillance; undercover operations; confidential source management; the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate drug violations.

    a. As a DEA Agent, I have participated in all aspects of drug investigations, including physical surveillance, installation and monitoring of GPS devices, execution of search warrants, arrests of drug traffickers, and Title-III wiretap investigations. I have participated in the execution of numerous search warrants seeking evidence of violations of the Federal Controlled Substances Act (Title 21 of the United States

Code). These warrants covered the search of locations such as residences of drug traffickers and their co-conspirators/associates, drug manufacturing operations, and stash houses used as storage and distribution points for controlled substances. I have also participated in the execution of search warrants for electronic devices and information, such as search warrants for e-mail accounts, mobile telephones, and GPS tracking devices.

b. By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and to remain at large without being detected by law enforcement. I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking and require large amounts of currency to operate surreptitiously. In this regard, I have obtained and executed numerous search warrants in which I have seized ledgers, notebooks, papers, and other related record-keeping instruments, all of which have been used to record multiple narcotics and related money laundering transactions. I have also seized telephone books, diaries, invoices, cellular telephones, and correspondence that contained evidence of narcotic trafficking and money laundering violations.

c. I have been involved in interviewing individuals post-arrest, defendants in conjunction with post-arrest proffers, confidential informants, and other non-defendant individuals with knowledge of illegal drug trafficking. During such interviews and through discussions with other experienced agents, I have become familiar with the day-to-day operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. This includes information about the packaging and preparation of narcotics, methods in which illicit drugs are smuggled, transported, and distributed, and security measures commonly employed by narcotics traffickers. These security measures include the use of firearms to protect their narcotics-related activities, and the use of cellular telephones, pagers, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

d. As a result of my participation in these and other activities, I have gained particular knowledge in the use of confidential informants, physical surveillance, consensual recordings, investigative interviews, garbage searches, pole-mounted cameras, and GPS tracking devices. Based on my training and experience, GPS tracking devices aid law enforcement in the investigation and detection of illegal drug trafficking by enabling agents to analyze the suspected trafficker's travel patterns. GPS data can aid law enforcement in identifying co-conspirators as well as stash houses, which are residences where contraband and instrumentalities of drug trafficking, such as firearms and drug paraphernalia, are stored.

e. In addition to using these and other investigative techniques, I have analyzed information from traditional record sources, such as financial records, utility records, and telephone toll and subscriber records. I have also analyzed nontraditional record sources such as the informal ledgers routinely maintained by narcotics traffickers. These informal ledgers, commonly referred to as pay-owe sheets, list amounts of drugs received from sources and distributed to customers and the amounts of money received from customers and owed to sources. I have also gained experience in the identification

and collection of drug and non-drug evidence, and the analysis and interpretation of taped conversations obtained by the methods detailed above.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is submitted for the limited purpose of demonstrating probable cause for the issuance of a criminal complaint and arrest warrant, and thus do not contain each and every fact that I know about the investigation.

## PROBABLE CAUSE

4. In March 2024, members of the DEA Charleston District Office began investigation Demetrius HARMON, Craig CATO, Christle SCARBERRY, Ryan PORTER, and their associates for the distribution of illicit controlled substances, including cocaine, fentanyl, and methamphetamine. That same month, a Cincinnati-DEA CS (the "CS") told law enforcement that HARMON was supplying a drug dealer in Cincinnati with approximately three kilograms of cocaine, and that the same drug dealer have previously supplied HARMON with three kilograms of cocaine.[1]

5. During the course of the investigation, law enforcement determined that Demetrius HARMON was the leader of, and supplier for, a Drug Trafficking Organization that stored large quantities of drugs in the residence located at 5380 Winchester Avenue, Portsmouth, Ohio (the "Winchester Stash House"). This information was corroborated through surveillance, intelligence, and controlled purchases. Additionally, it was determined that HARMON's so-called "Uncle" – Craig CATO – was residing at and operating the Winchester Stash House, which was supplied by HARMON. For instance, on several occasions throughout the investigation, CATO advised different confidential sources that he was running low or out of drugs. On these occasions, once

---

[1] The CS is cooperating in exchange for case consideration. The CS has been cooperating with law enforcement for approximately one year. During that time, the CS has provided information to law enforcement, some of which has been independently corroborated. As such, law enforcement believes the CS has provided reliable information. The CS has a criminal history involving drug trafficking, drug possession, domestic violence, firearms offenses, assault, menacing, and obstructing.

3

CATO was out/low, HARMON and/or HARMON's vehicles were observed arriving at or in the area of the stash house (in order to re-supply the stash house). After HARMON arrived and/or departed from the Winchester Stash House, CATO would reach out to the confidential source(s) and advise them that he had obtained the requested drugs. Based on the timing and surveillance of HARMON's travel to the Winchester Stash House, HARMON is the only one who could have supplied the drugs. Furthermore, HARMON's vehicles were observed at the Winchester Stash House with a high degree of frequency, ranging from daily to weekly. Additionally, extensive surveillance was conducted on the stash house and numerous vehicles from multiple states were observed arriving and departing the residence. During the month of April 2024, law enforcement conducted surveillance at the Winchester Stash House on several occasions. During the surveillance, law enforcement regularly observed vehicles used by HARMON at the stash house, including vehicles containing plates that belonged to other cars. This is a common tactic used by drug traffickers to avoid detection.

6. On or about June 10, 2024, HARMON was on state probation, and informed the PMC Probation Department that he would be frequenting 5380 Winchester Avenue, Portsmouth, Ohio. HARMON told probation that this address was where his business operated: "Sand Box Kennel Club Elite." Additionally, HARMON provided the Probation Department with a business license from the Scioto County Auditor's Office with the address of the Winchester Stash House HARMON's GPS ankle monitor data shows HARMON at or near the Winchester Stash House on numerous occasions. CS1 advised the dog kennel business is a front for HARMON's drug trafficking activities. Furthermore, based on my training and experience, I know that it is common for drug traffickers to create fictitious LLCs in an attempt to avoid law enforcement detection.

7. On June 18, 2024, a confidential source (the "CS1") informed law enforcement that HARMON was selling cocaine and methamphetamine, and that CS1 had previously seen

4

HARMON with approximately 70-80 pounds of cocaine, and 100 pounds of methamphetamine.[2] According to CS1, HARMON had a residence on Winchester, in Sciotoville, Ohio. CS1 was shown a photograph of the Winchester Stash House, and confirmed the house depicted in the photograph was HARMON's home that they were referring to. CS1 advised he/she knows HARMON and/or his associates to sell methamphetamine, cocaine, and fentanyl (gray, white, and blue). CS1 confirmed that HARMON worked with CATO to distribute controlled substances. According to CS1, they had acquired 56 grams of methamphetamine from HARMON recently (from the Winchester Stash House), and had been acquiring ounce-level quantities of controlled substances from HARMON on a daily basis (generally out of the Winchester Stash House, or supplied from the Winchester Stash House).

8. On June 29, 2024, law enforcement initiated a traffic stop on a 2009 Volkswagen Jetta bearing Ohio registration, being driven by Individual-1, for driving at an abnormally slow rate of speed in Pike County, Ohio. Individual-1 was arrested for Driving While Under the Influence of Alcohol and/or Drugs. After being advised of their *Miranda* Rights, Individual-1 admitted to using methamphetamine a few days prior to the traffic stop. Individual-1's car was searched incident to arrest for operating a vehicle under the influence. Individual-1 told law enforcement there were drugs in the car, and that the drugs on their person came from "selling drugs" for "people up north." When asked about the drugs in the car, Individual-1 said there was a "good bit" – probably at least half a pound. A bag was located on the front seat of the vehicle. The bag contained a hard red case that contained 16 individually packed plastic bags. Fifteen bags contained a white crystal-like substance that was identified as methamphetamine by law

---

[2] CS1 is cooperating in exchange for case consideration. CS1 cooperated beginning in the summer of 2024 and lasted a few months, but has since been deactivated for sending unsolicited and inappropriate photos to her handling agent. CS1 has a criminal history involving thefts, drug offenses, among other things. Some of the information provided by CS1 has been independently corroborated by law enforcement, such that I believe the information provided by CS1 has been reliable and accurate.

5

enforcement. The Ohio Highway Patrol Lab identified the suspected methamphetamine as approximately 404.2 grams of methamphetamine. The other bag contained a white powdery substance that law enforcement identified as a fentanyl related compound. The white powdery substance was identified by the Ohio Highway Patrol Lab as approximately 58.8 grams of fentanyl. According to Individual-1, the drugs in the car came from Sciotoville, Ohio – which is where the Winchester Stash House is located. Additionally, approximately $4,000 was seized from Individual-1's person. The CS1 was interviewed about this traffic stop, and told law enforcement that HARMON was the source of supply for the drugs found in Individual-1's car.

9. On July 5, 2024, law enforcement spoke to CS1 via telephone. CS1 advised that they had spoken to "Unc" which is a reference to CATO (who HARMON referred to as "uncle" or "unc"). CATO told CS1 that HARMON was spooked as a result of Individual-1's arrest. According to CS1, Individual-1 was arrested in Pike County, Ohio, and was found to be in possession of approximately one pound of methamphetamine and approximately one ounce of fentanyl. According to CS1, CATO had told CS1 that Individual-1 had informed HARMON about the stop/arrest.

10. On July 11, 2024, law enforcement worked with CS1 to conduct a controlled purchase of approximately 112 grams of methamphetamine from CATO for $500. The controlled purchase took place at the Winchester Stash House. The controlled purchased was audio/video recorded. During the controlled purchase, CATO provided the CS with the methamphetamine the CS had ordered, which lab tested as 104.58 grams of methamphetamine, with a 96% purity. During the controlled purchase, CATO called HARMON, and the CS learned that HARMON was coming to the Winchester Stash House to deliver fentanyl to CATO. Thereafter, the CS left the location and returned the methamphetamine to law enforcement. Location monitoring for HARMON,

along with surveillance, confirmed that he did in fact travel to 5380 Winchester after that phone call with CATO.

11. On July 20, 2024, law enforcement conducted surveillance on the Winchester Stash House, and observed a red Chevrolet Silverado pickup truck parked behind the residence. Ryan PORTER exited the vehicle and walked towards the rear of the residence. Later, PORTER returned to the red truck. Upon exiting the residence, he was carrying a small dark bag. He then departed the residence in the truck. The truck was stopped in Ironton, Ohio due to a traffic infraction. PORTER was driving the car, and another man was in the passenger seat. A drug dog alerted on the vehicle for the presence of narcotics, and law enforcement searched the vehicle. Inside the vehicle, on the front passenger floorboard, law enforcement located controlled substances, including suspected methamphetamine and fentanyl. The controlled substances were lab-tested, which found that the drugs were 324.9 grams of Methamphetamine Hydrochloride and 75.04 grams of a mixture containing Fentanyl, p-Fluorofentanyl, Heroin, Tramadol, Diphenhydramine, Niacinamide, Xylazine, and Acetaminophen.

12. On July 25, 2024, law enforcement again conducted surveillance on 5380 Winchester Avenue, Portsmouth, Ohio. Investigators monitored a pole camera and observed a maroon Honda Accord arrive and park to the rear of the residence. Ryan PORTER was observed exiting the vehicle and walking to the rear of the residence. PORTER returned to the vehicle and entered the front passenger seat. The vehicle departed the residence and investigators followed the vehicle away from the residence and into Kentucky. A traffic stop was conducted on the vehicle for traffic infractions. PORTER was in the passenger seat, and a different man was driving (i.e., different that PORTER's companion on July 20, 2024). The vehicle was searched as law enforcement observed a white powdery substance in a knotted plastic bag in plain view in the area of the gear shifter. Inside, law enforcement located suspected cocaine (with the driver), fentanyl

7

(on PORTER), methamphetamine (five pills in the passenger side floorboard), and a firearm in the center console of the vehicle. PORTER was taken into custody, and – while in the cruiser – attempted to discard the approximately 28 grams of suspected fentanyl he had hidden in his crotch. PORTER told law enforcement that it was their job to catch him, and that it was his job to get away. The suspected fentanyl that PORTER tried to discard was tested by the DEA Mid-Atlantic Laboratory and identified as 25.081 grams of fentanyl, p-Fluorofentanyl, and Heroin. The pills referenced above were identified by the DEA Mid-Atlantic Laboratory as Methamphetamine, approximately 1.858 grams. The suspected cocaine was identified as approximately 14.91 grams of cocaine, and approximately 2.5 grams of cocaine.

13. Additionally, phone tolls were conducted on CATO and HARMON's telephone numbers. On July 20, 2024, PORTER was in communication with HARMON's suspected cell phone five times, and with CATO five times.

14. On August 6, 2024, law enforcement interviewed another confidential source ("CS2") regarding the drug trafficking activities of CATO.[3] CS2 informed law enforcement that they had purchased drugs from CATO at a residence located off of the Sciotoville exit on Winchester Avenue in Portsmouth, Ohio. CS2 later reviewed a map of the area, and confirmed that this was a reference to the Winchester Stash House. CS2 stated that CATO sold 3.5 grams of fentanyl for $200. CS2 stated that they had observed a gallon size Ziploc baggie half full of methamphetamine and fentanyl previously while at the Winchester Stash House. According to CS2, CATO stored the drugs inside a DeWalt tool bag.

15. On or about August 8, 2024, CS2 contacted CATO to conduct a controlled purchase of fentanyl. This conversation was recorded. Then, CS2 drove to the Winchester Stash House to

---

[3] CS2 is cooperating in exchange for case consideration. CS2 has been cooperating since August 2024. CS2 has a criminal history that consist of drug offenses and traffic offenses. Some of the information provided by CS2 has been independently corroborated by law enforcement, such that I believe the information provided by CS2 has been reliable and accurate.

8

purchase the fentanyl arranged by CATO. The controlled purchase was audio/video recorded. Upon arriving, CS2 met with Christle Dawn SCARBERRY, who provided the "fentanyl" to CS2. The fentanyl was lab tested, which showed that the substance sold was approximately 7 grams of a mixture containing heroin and tramadol.

16. On or about August 9, 2024, law enforcement interviewed a different CS ("CS3").[4] CS3 explained that alias "Shark" and his brother (HARMON) sold cocaine to CS3's friend. According to CS3, alias "Shark" lived at the Winchester Stash House, and sold large quantities of drugs (bricks).

17. Also on August 9, 2024, law enforcement worked with CS3 to conduct a controlled purchase of approximately 14.8 grams of cocaine and 4.2 grams of crack cocaine from Craig CATO for $550. The controlled purchase took place at the Winchester Stash House. The transaction was audio/video recorded, and the drugs purchased field-tested positive for cocaine and cocaine base (crack).

18. On August 10, 2024, CS1 contacted law enforcement concerning HARMON. According to CS1, HARMON had reached out via FaceTime saying he hadn't been answering his phone because he just got a large shipment of methamphetamine, fentanyl and cocaine in.

19. On August 14, 2024, law enforcement worked with CS2 to conduct a controlled purchase of approximately 7 grams of fentanyl and one ounce of methamphetamine from Craig CATO for $600. The controlled purchase took place at 5380 Winchester Road, Portsmouth, Ohio. The transaction was audio/video recorded, and the drugs purchased were lab-test-confirmed to contain Methamphetamine, Tramadol, Fentanyl, p-Fluorofentanyl, and Methorphan.

---

[4] CS3 is cooperating in exchange for case consideration. The CS have been cooperating since approximately August 2024. The CS has a criminal history involving drug offenses, firearm offenses, among other things. Some of the information CS3 has provided has been corroborated by law enforcement, such that I believe the information provided by CS3 to his point has been reliable and accurate.

20. On August 14, 2024, law enforcement worked with CS3 to conduct a controlled purchase of approximately 112 grams of methamphetamine and 14 grams of crack cocaine from Craig CATO for $950. The controlled purchase took place at the Winchester Stash House. The transaction was audio/video recorded. The methamphetamine was lab tested, and confirmed to contain methamphetamine. The crack cocaine field tested positive for cocaine base.

21. On August 19, 2024, CS3 made a controlled, recorded telephone call to CATO to arrange a controlled purchase of approximately one pound of methamphetamine and one ounce of crack cocaine. During the conversation, CATO advised CS3 that he had sold all of the "Ice" (methamphetamine), but had "Soft" (cocaine), and "food" (heroin/fentanyl). CATO advised CS3 that he would be acquiring additional methamphetamine later this date. CS3 and CATO agreed on the purchase two ounces of cocaine and one ounce of fentanyl, for $3,000. The controlled purchase took place at the Winchester Stash House, and the drugs sold by CATO were later lab tested. They were found to contain 24.94 grams of a mixture containing tramadol and fentanyl, and 56.42 grams of cocaine.

22. On August 22, 2024, law enforcement conducted surveillance on 5380 Winchester Avenue, in Portsmouth, Ohio. During surveillance, law enforcement saw HARMON's car leave the residence, and also saw a black Cadillac Escalade leave the residence. The Escalade was later traffic-stopped due to a marked lane violation. The operator of the vehicle was very nervous and read his/her Miranda Warning. The operator admitted to picking up a "stem" smoking device/crack pipe from inside his/her vehicle and placing it inside his/her wallet. The smoking device was seized and a probable cause search was conducted on the vehicle. In a vehicle compartment, law enforcement located approximately 1.1 pounds of a purple powdery substance, originally suspected to be fentanyl. The operator of the vehicle said that they had received the

substance from HARMON, and believe that it may have contained cocaine. The substance was later lab-tested, and found the be a cutting agent called Quinine.

23. On August 27, 2024, law enforcement and CS3 made a recorded controlled call to CATO to arrange to purchase one pound of methamphetamine. During the conversation between CATO and CS3, CATO indicated that he only had around one half of a pound of Methamphetamine and it may take a few days to get the pound. CS3 and CATO agreed that, if CATO got more methamphetamine, he would call CS3, or CS3 would reach back out in a few days. At around 12:45 pm that day, HARMON was observed getting into his car and leaving 7 North Bennett St., South Webster, Ohio. When HARMON entered the car, he appeared to have a cross body bag strapped over his shoulder. At approximately 1:09 p.m., HARMON was observed arriving at the Winchester Stash House, and parking near the rear of the residence. HARMON exited the vehicle, and walked towards the rear of the residence, while still carrying the cross body bag. At approximately 1:42 p.m., HARMON exited the Winchester Stash House and left the area. At approximately 1:51 p.m. CS3 contacted law enforcement to inform them that CATO had reached back out, and confirmed he was now good for the pound of methamphetamine, and that he actually had three pounds, if CS3 wanted more. Note, the bag that HARMON entered the Winchester Stash House with appeared that it may have been large enough to fit three pounds of methamphetamine. Based on my training and experience, I believe that HARMON delivered the methamphetamine to CATO when he travelled to the Winchester Stash House.

24. Shortly after the call, CS3 travelled to the Winchester Stash House and conducted a controlled (and audio/video recorded) purchase of approximately one pound of methamphetamine from CATO. The methamphetamine was field tested, which confirmed it was methamphetamine. CS3 later reported to law enforcement that they had seen two additional pounds of methamphetamine in CATO's possession during the controlled purchase.

25. On September 6, 2024, law enforcement utilized CS3 to purchase approximately four ounces of methamphetamine from CATO at the Winchester Stash House. The controlled purchase was audio/video recorded. The methamphetamine was lab tested, and confirmed to contain approximately 111.06 grams of methamphetamine, with a 96% purity.

26. On September 11, 2024, law enforcement worked with CS3 to conduct a controlled purchase from CATO and SCARBERRY. On that day, CS3 called CATO to arrange to purchase four ounces of methamphetamine. That call was audio recorded. After agreeing to a deal with CATO, CS3 travelled to the Winchester Stash House. Upon arrival, SCARBERRY sold CS2 approximately 106 grams of methamphetamine at CATO's direction. The methamphetamine field-tested positive for methamphetamine. This transaction was audio/video recorded.

27. On September 30, 2024, HARMON's car travelled to Columbus, Ohio. That same day, law enforcement observed a silver Saturn Vue in Columbus, that was known to frequent 5380 Winchester Avenue. The Vue was associated with CATO as: (1) it had been observed at the residence located at 5380 Winchester Avenue on several occasions; and (2) previously, a traffic stop was conducted on this vehicle and CATO was an occupant of the vehicle. On September 30, 2024, the Vue was seen leaving the Winchester Stash House. As explained later, the driver of the Vue explained that they had left Winchester with CATO. According to the driver, CATO explained that he needed a ride to Columbus to meet his "nephew" referred to as "Moochie" (a reference to HARMON). After that, according to the driver, they went to a clothing store in the Columbus area. At the store, according to the driver, CATO got out, retrieved a suitcase, and put it in the car. When the Vue returned to Scioto County, it was traffic-stopped for a traffic infraction and searched after a Narcotics K9 indication for the presence of narcotics. In the Vue, law enforcement located two kilograms of suspected fentanyl, in brick shape, located within a suitcase in the luggage compartment of the SUV. Law enforcement field tested one of the bricks, and it

12

field tested positive as fentanyl. As detailed above, the driver gave a post-*Miranda* statement, spoke with law enforcement, and explained what had happened that day on their trip to Columbus. This affiant knows HARMON to use the alias "Meech" or "Meechie" – and CATO/HARMON refer to each other as nephew/uncle. This affiant believes HARMON is the individual the driver was referring to CATO meeting ("Moochie"), as HARMON's vehicle (GPS tracker/Flock Camera) was in Columbus, Ohio at the same time the Saturn Vue was. Based on my training and experience, I believe HARMON supplied CATO with the two bricks found in the suitcase that day.

## CONCLUSION

28. Based on the information above, there is probable cause to arrest and charge Demetrius HARMON, Craig CATO, Christle SCARBERRY, and Ryan PORTER with: (1) conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846 (all Defendants); (2) distribution of controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (HARMON, CATO, and SCARBERRY); and (3) possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (all Defendants).

Respectfully submitted,

*Brandon Harris*

Brandon Harris
DEA Special Agent

Subscribed and sworn to me via FaceTime
on this 15 day of October 2024.

*Karen L. Litkovitz*
Karen L. Litkovitz
United States Magistrate Judge

13